THOMAS PEYTON SELLERS, COMPLAINANT-RESPONDENT, v. PHILIP'S BARBER SHOP AND PHILIP GATTI, OWNER, RESPONDENT-APPELLANT.

REGINALD BARROW, COMPLAINANT-RESPONDENT, v. PHILIP GATTI, T/A PHILIP'S BARBER SHOP, RESPONDENT-APPELLANT.

Argued January 25, 1966—Decided February 21, 1966.

*Messrs. Albert F. Dalena and Paul Colvin* argued the cause for respondent-appellant (*Mr. Albert F. Dalena,* attorney; *Messrs. Dalena, Colvin* and *Joseph D. McGlone,* of counsel).

*Mr. Joseph A. Hoffman,* Deputy Attorney General, argued the cause for respondent, State of New Jersey (*Mr. Arthur J. Sills,* Attorney General of New Jersey, attorney, *Mr. Hoffman,* of counsel).

The opinion of the court was delivered by

FRANCIS, J. Philip Gatti, trading as Philip's Barber Shop, owns and operates a barber shop in Madison, N. J. He and his shop are licensed under *N. J. S. A.* 45:4–27 *et seq.* He has been barbering for over 25 years. Thomas Peyton Sellers and Reginald Barrow are residents of that borough. On April 23, 1964, Sellers entered Gatti's shop to obtain a haircut. Barrow went there on May 7, 1964 for the same purpose. Gatti refused the service to both of them.

Thereafter, Sellers and Barrow filed complaints against Gatti in the Division of Civil Rights, Department of Law and Public Safety, charging that he refused to cut their hair because they are members of the Negro race and thus violated section 12(f) of the Law Against Discrimination, *N. J. S. A.* 18:25–1 *et seq.*

Section 4 of the act says:

"All persons shall have the opportunity * * * to obtain all the accommodations, advantages, facilities, and privileges of *any place of public accommodation* * * * without discrimination because of race, creed, color, national origin, ancestry or age, subject only to conditions and limitations applicable alike to all persons. This opportunity is recognized as and declared to be a civil right." (Emphasis added; *N. J. S. A.* 18:25–4)

Section 12(f) provides:

"It shall be * * * an unlawful discrimination:
*     *     *     *     *     *     *     *
f. For any owner, * * * or employee of any place of public accommodation directly or indirectly to refuse, withhold from or deny to any person any of the accommodations, advantages, facilities or privileges thereof, or to discriminate against any person in the furnishing thereof, * * *." *N. J. S. A.* 18:25–12(f).

Gatti denied the alleged violations, asserting primarily (1) his barber shop is not a "place of public accommodation" within the contemplation of the statute, and (2) he did not refuse a haircut to Sellers and Barrow because they are Negroes, but rather because he was not trained to cut Ne-

groes' hair and did not consider himself competent to cut it on account of its unusual texture and quality. After full hearing and report from the Examiner, the Division rejected both of these claims, and entered an order, which among other things, directed him to cease and desist from refusing to cut Sellers' and Barrow's hair or the hair of other Negroes or of any other persons, because of their race, color, creed, ancestry or national origin. The order contained other remedial measures, including directions to (1) communicate with Sellers and Barrow and to offer to cut their hair, (2) to instruct his employees in writing to furnish the services provided in the shop to all persons without discrimination on account of race, creed or color, ancestry or national origin, and to post copies of the Division order as well as the written instructions to the employees in a conspicuous place in the shop for a period of a year. Gatti sought a review in the Appellate Division, but we certified the matter before argument there.

## I.

### Is A Barber Shop a Place of Public Accommodation?

Gatti contends that a barber shop is a place where personal services are rendered at the will or whim of the barber and that he may refuse to cut the hair of any person because of race, color or for any other reason that suits his fancy. He points out that a "place of public accommodation" is not specifically defined in the statute. Instead of doing so, he says, the Legislature listed the business establishments which were to be considered as within the category. And since barber shops were not included, he contends the lawmakers intended to exclude them. We have dealt with the same claim in another context and have held that since *N. J. S. A.* 18:25–5(*l*) ordains that a place of public accommodation "shall include," and then goes on to list a substantial number of business, occupational, recreational and educational enterprises, the specification is not a limitation but simply a general illustration of the type of enterprise intended to be within the boundaries of the law. Moreover, in light of the

type of activity carried on in the places listed as examples of places of public accommodation, we have given the term a common sense definition, which in our judgment clearly portrays and effectuates the legislative intent. An establishment which caters to the public or by advertising or other forms of invitation induces patronage generally is a place of public accommodation, and cannot employ race, creed or color as a basis for refusing to serve members of the public who have accepted the invitation. *Fraser v. Robin Dee Day Camp,* 44 *N. J.* 480 (1965); *Evans v. Ross,* 57 *N. J. Super.* 223, 231 (*App. Div.* 1959), certif. denied 31 *N. J.* 292 (1960); *Practice Before New Jersey Administrative Agencies* (1964) 113. To anyone who has ever seen the revolving peppermint stick pole, it would be idle to suggest that its invitation to enter the shop for a haircut was not a general public one. Even in these more sophisticated days when the brightly colored pole, like the cigar store Indian, is slipping away gradually into the things that were, no user of the barber's services considers the open door of the shop any less public an invitation to enter. By statute a barber shop at present must have a barber pole or a sign "clearly legible, indicating that it is a barber shop," and if a shop is in a private home, entrance thereto must be from the public street. *N. J. S. A.* 45:4–52.

But aside from common understanding and acceptance by the people that a barber shop is a place to which the public is invited indiscriminately, there is greater reason to regard it as a place of public accommodation than exists in many of the specific examples appearing in the statute. It is common knowledge that at the barbers' behest the Legislature gave them special status, and agreed that they and their shops bore a sufficiently close relation to the health and welfare of their patrons to justify their licensing and regulation in the public interest.

A person who wishes to enter the barbering craft must register as an apprentice with the State Board of Barber Examiners. Educational and other qualifications are prescribed. After serving an apprenticeship with a registered

barber for 18 months he must pass an examination given by the Board to determine his fitness to practice barbering. *N. J. S. A.* 45:4–27, 29.2, 31. The practice of barbering is defined among other things as "[s]having or trimming the beard or cutting the hair" etc. "when done for payment either directly or indirectly or without payment *for the public generally.*" (Emphasis added) *N. J. S. A.* 45:4–28. The examination given to an applicant for license includes both a practical demonstration and a written and oral test embracing: "[s]cientific fundamentals for barbering; hygiene, bacteriology, histology of the hair, skin, muscles and nerves, structure of the head, face and neck, elementary chemistry relating to sterilization and antiseptics, diseases of the skin, hair, glands, and nails, *hair cutting,* shaving and arranging, dressing, coloring, bleaching and tinting the hair." (Emphasis added) *N. J. S. A.* 45:4–33. If the apprentice passes the examination he is registered or licensed to practice barbering. *N. J. S. A.* 45:4–31, 34.

No person may operate a barber shop without a license to do so from the State Board of Barber Examiners. To receive such a license (with a few exceptions not material here), he must have had at least two years' experience as a registered barber of this State immediately prior to his application, or his shop must be under the direct supervision of a registered barber with a like period of registration and service. *N. J. S. A.* 45:4–50.2. Many sanitary and operational regulations are imposed upon the licensed shops in the public interest. See *N. J. S. A.* 45:4–52.

Certain conclusions must be drawn from the cited statutes. The practice of barbering and the operation of barber shops have a sufficiently intimate relationship with the public interest and welfare to justify licensing and regulation of barbers and their shops. The public need for the service made available by the craft is sufficiently urgent to warrant legislative imposition of training and skill qualifications upon applicants for a license to practice barbering. The statutes mean also that once licensed or registered the barbers have a

lawful monopoly of the practice of barbering, *i. e.*, among other things, of cutting hair "for the public generally" for payment. And the license signifies further that its holder has demonstrated to the satisfaction of the Board of Barber Examiners that he is qualified in "hair cutting"—not just Caucasian hair, but the hair that grows on the head of any human being. If his competence does not extend that far, he lacks the legislatively established qualifications for license. Moreover, we believe that in the future the Board should inquire into the willingness of each candidate for a license to cut the hair of any applying patron regardless of race, color, creed, national origin, ancestry or age. If he reveals an unwillingness to do so, obviously he does not meet the standards for a license.[1]

■ As we have indicated the license and registration of the barber and his shop, with the accompanying monopoly of the practice of barbering have brought him into the public do-

[1] On August 4, 1964 the Board in the pursuit of its supervisory jurisdiction over barbers sent the following communique to them:
"TO : All Licensees

During recent discussions between the Board of Barber Examiners and the Director and staff of the Division on Civil Rights of the Department of Law and Public Safety, it was pointed out by the representative of that Division that some barbers in this State have frequently refused to serve non-white individuals on the ground that they do not know how to cut their hair.

This Board observed that:

1. All persons licensed by the Board of Barber Examiners *do* have the basic knowledge of how to cut and shave the hair of people of *all* races ;

2. Although some barbers who had not cut or shaved the hair of non-white persons during their apprenticeships might not be as skillful with the first few non-white customers they served as they would be after more experience, they could and should render such services when requested ;

3. A statement by any licensed barber, given as a reason for denying service to non-white persons, that he did not know how to cut or shave their hair, would be untrue.

The Board of Barber Examiners was reminded in these discussions by representatives of the Attorney General of New Jersey that the Board is obliged by statute either to refuse to issue or renew, or to suspend or revoke, any license or certificate of registration for, among

main and given him a special status. So long as he holds that status he cannot discriminate against a prospective patron who seeks his service, be he Negro or of any other race, any more than a lawyer or other professional person may discriminate for that reason.

In short, we are satisfied a barber shop is a place of public accommodation within the contemplation of the Law Against Discrimination, and that the statute is violated when the operator of such a shop refuses to cut the hair of a patron because he is a Negro. More specifically, in this case, we find ample evidence in the record to support the finding of the Division that the reason Gatti refused his services to Sellers and Barrow is because they are Negroes. We agree also with the Division's conclusion that Gatti's refusal was not on account of his inability to cut their hair (he had never tried to do so at any time in the past), but rather because he was unwilling to do so. Finally, we concur in the determination that the alleged requirement for an appointment for a haircut was simply a subterfuge of Gatti's to avoid opening his chairs to Negroes. As was said in *Jones v. Haridor Realty Corp.,* 37 *N. J.* 384, 396 (1962): "No device, whether innocent or subtly purposeful, can be permitted to frustrate the legislative determination to prevent discrimination."

## II.

Gatti further assails the order of the Division directing him to offer to cut the hair of Sellers and Barrow as imposing involuntary servitude on him in violation of the

---

other reasons, gross malpractice, gross incompetence or unprofessional conduct.

Any barber who refuses to cut or shave the hair of non-white persons on the ground that he does not know how to do so would be subject to the provisions of this statute.

/s/ *Frank Marchese,*
Frank Marchese, Secretary
Board of Barber Examiners"

Thirteenth Amendment of the Federal Constitution.[2] The suggestion is frivolous. The order does not compel him to continue in the practice of barbering. It simply imposes on him the reasonable and constitutional prohibition against discrimination on account of race, creed or color, if he desires to continue. See *David v. Vesta Co.*, 45 *N. J.* 301, 319–321 (1965).

## III.

The additional arguments advanced against validity of the Division's action have been examined and found to be without merit.

For the reasons expressed the order appealed from is affirmed.

*For affirmance* — Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN —7.

*For reversal*—None.

---

[2] The Thirteenth Amendment provides:

"Section 1. Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction."